# Black Star Coal Corporation v. Napier et al.

## Same v. Bailey et al.

January 31, 1947.

Cleon K. Calvert for appellant.

C. W. Hoskins for appellees.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

These two actions were consolidated and heard together in the circuit court. In the first styled case the Black Star Coal Corporation, hereinafter referred to as the Company, sought to enjoin Pearl and Frank Napier from cutting timber upon certain land, the fee of which was in the Company. The Napiers asserted no claim to the timber but averred in their answer that they went on the land under authority from the heirs of W. E.

McCoy. The McCoy heirs brought the second action to enjoin the Company from interfering with their removing the timber from the land. The chancellor refused to grant an injunction to the Company, but did grant the relief asked by the McCoy heirs and enjoined the Company from interfering with them in cutting the timber. The Company appeals.

By a written contract of February 18, 1941, the Company sold to Linkes Hardwood Company, hereinafter referred to as Linkes, all the white oak "timber trees" 17 inches in diameter standing and growing on certain of its lands in Leslie County, which according to the testimony contains all the way from 894 to 1300 acres. Linkes was given two years in which to remove the timber. Just before the cutting was finished under that contract the same parties entered into a second writing on July 23, 1941, wherein the Company sold to Linkes all the "saw timber" 16 inches in diameter 18 inches above the ground. This second contract expressly recited that it might be assigned subject to all of its terms and conditions, and contained this provision: "The party of the second part (Linkes) is given five years time in which to remove the timber, however, as the timber is worked out, second party is not to reenter at a later date."

Linkes never cut any timber under this second contract, and by a writing without date, but acknowledged on September 18, 1941, assigned it to Mowbray & Robinson Company, which engaged John Asher and Owen Sizemore to remove the timber. They started work the last week in September 1941 and finished the first part of January 1943. To make sure that Asher and Sizemore performed their contract, Mowbray & Robinson retained 10% of the contract price. In the fall of 1942 Mowbray & Robinson inspected the land and directed more cutting, which Asher and Sizemore did. In January 1943, Mowbray & Robinson directed them to cease cutting and paid Asher and Sizemore the 10% which had been withheld on the cutting contract.

Mowbray & Robinson by contract dated March 20, 1943, sold to Owen Sizemore all their right in the remaining timber and on the following May 27th Sizemore conveyed his interest therein to W. E. McCoy, with the

exception of a certain part the deed recited had been conveyed theretofore to R. B. Mosley. It does not appear from the record that Mosley ever attempted to cut any of the timber. Shortly after acquiring the timber McCoy died and his widow (now Mrs. Bailey) and heirs contracted with Pearl and Frank Napier to cut the timber. It was the attempt of the Company to stop the Napiers from cutting timber that precipitated this litigation.

It is insisted by the Company that the provision in the contract reading, "The party of the second part is given five years time in which to remove the timber, however, as the timber is worked out, second party is not to reenter at a later date," means that whenever the labor of cutting and removing the timber once starts, the purchaser should take all the timber he wants to take, and after he has taken timber to his entire satisfaction and has abandoned further taking, he has no right to enter subsequently and take more timber. To express it tersely, the Company contends the above-quoted provision of the contract means that although the purchaser has five years within which to remove the timber, he must cut it clean as he goes, and after once cutting over an area the purchaser cannot return thereto, even in the five year term, and remove further timber.

The appellees contend that they have the entire five years to remove the timber and can work over the land as many times as they please in getting out the timber, and that it is only after the timber is worked out, or exhausted, that they are forbidden from re-entering on the land. They argue that any other construction of the contract would work a forfeiture, although the contract contains no forfeiture provision, as the purchaser may have a market at a certain time for one species of timber, say hickory, and after going over the whole tract and cutting all the hickory, he could not return later and cut the various other species.

In construing contracts there are certain familiar rules which guide courts. The primary rule is to ascertain and give effect, if possible, to the mutual intention of the parties. 17 C. J. S., Contracts, sec. 295, p. 589. Words will be construed in the sense they are employed by the parties, and unless a contrary intention appears,

they will be given their ordinary meaning, 17 C. J. S., Contracts, sec. 300 and sec. 301, pp. 717 and 718. If the contract contains inconsistent clauses, they should be reconciled if possible, but the clause contributing most essentially to the contract is entitled to the greater consideration; if they both cannot stand, the first will ordinarily prevail over the second. 17 C. J. S., Contracts, sec. 309, p. 726. Unless there is a clear intention of forfeiture by the parties, the contract should be so construed as to avoid a forfeiture, if reasonably possible. 17 C. J. S., Contracts, sec. 320, p. 742. A reasonable construction by the parties of an ambiguous contract, although not conclusive, will be given great weight by the court, and such construction is best evidenced by the voluntary and positive acts of the parties in executing the contract. 17 C. J. S., Contracts, sec. 325, p. 755.

With these rules in mind, we will take a look at the contract. It was the evident intention of the parties that the Company was selling all the timber 16 inches in diameter 18 inches above the ground on this land and that the purchaser was to have ample time to remove it. Webster's New International Dictionary defines "work out" as meaning "to exhaust, as a mine, by working." In Commercial Coal Mining Co. v. Big Bend Coal Mining Co., 293 Pa. 39, 141 A. 732, 733, the Supreme Court of Pennsylvania had before it the interpretation of a contract providing that the Commercial Company should furnish drainage to the Big Bend Company until "all of the No. 3 mine * * * has been worked out." It was there held that the term "worked out" means exhausted, and the court required the Commercial Company to furnish drainage as long as there was coal in No. 3 which could be mined in commercial quantity.

The Company argues that the parties to this contract put a practical construction on this ambiguous provision as meaning that when the purchaser once worked over this timber it could not re-enter for further cutting, and that under the rule above stated that construction should have great weight with the court. Many authorities are cited to sustain its position such as Page on Contracts (Supplement) sec. 2034, p. 1387; Westinghouse Electric & Manufacturing Co. v. Greenville Coal Co., 169 Ky. 280, 183 S. W. 901; Consolidation Coal Co.

v. Gibbs, 190 Ky. 717, 228 S. W. 416. Appellees admit this is the rule but argue that a practical construction to be adopted by the court must be reasonable, and that the mere opinion of the parties not carried into effect by any act does not amount to a practical construction.

C. B. Burchfield and Roscoe Green, the respective manager and land agent of the Company, and Clifford Randall, a partner in the Linkes firm, all testified that they construed the contract to mean that the purchaser must cut clean as he goes; that when he once has worked over the land he cannot go back and resume cutting. But a little further along in his testimony, Randall stated that as long as the purchaser continues to cut under the contract he may go back and do further cutting.

Such a construction of the contract is neither reasonable nor practical and reads into it provisions it does not contain. Indeed, the action of these parties shows they did not actually so construe the contract, since in the fall of 1942 Mowbray & Robinson after inspecting the land directed more cutting. Manifestly, it is not reasonable to interpret this contract as meaning that the purchaser after going over the entire land and cutting the trees of a certain size, or species, could not return a month or a year later, so long as it was within the five year interim, and remove trees of another dimension or of a different species. If a purchaser wanted only the ash, would it be a practical construction of this contract to say that after cutting ash over the entire boundary the first year, it could not sell the other species of timber to one who wanted to log and manufacture them? It is manifest that such a construction is not practical and was never put into effect by the parties. If such an interpretation be given the contract, then the original purchaser by not cutting all the timber as it went might lose by forfeiture the greater part of what had been bought, albeit the contract contains no provision of forfeiture. Unless there is a clear intention of forfeiture by the parties, a contract should be construed to avoid a forfeiture. The contract provides it may be assigned. However, under the construction as contended for by the Company if the original purchaser should remove one species, or size, of timber from all the land and convey the balance of the timber to another, the assignee could

not enter because the land had been previously cut over. That could not be a reasonable and practical construction of this contract.

The correct interpretation of the clause in controversy is that given by the appellees—after the timber is worked to exhaustion, the purchaser cannot enter at a later date and cut trees which have grown to the minimum dimension called for in the contract. This contract gives the purchaser five years to remove all trees 16 inches in diameter. When it was executed in 1941 many trees must have been just under that size and it is patent that the parties intended that after the purchaser had worked out the timber, he could not re-enter the worked out area for the purpose of cutting timber therein which had grown to 16 inches in diameter after the contract had been performed.

There is a wide divergence in the testimony as to the number of trees left standing on this land by Mowbray & Robinson which are of sufficient size to be covered by the contract. It ranges all the way from 500 to 2600 trees, which at the present price of lumber makes them worth a considerable sum. While not directly in point, Buckwalter v. Hutcherson, 66 S. W. 602, 23 Ky. Law Rep. 2074 and Sansom v. Edwards, 148 Ky. 503, 146 S. W. 1106, cited by appellees, hold that a purchaser had the right within the time provided in the contract to re-enter and remove timber which had been passed up on the first cutting.

The judgment is affirmed.