Edgar C. WALKER et al., Appellants,

v.

Clarence M. KEITH, Appellee.

Court of Appeals of Kentucky.

June 26, 1964.

Rehearing Denied Oct. 16, 1964.

G. D. Milliken, Jr., Marshall Funk, Bowling Green, for appellants.

Joe B. Orr, Bell, Orr & Reynolds, Bowling Green, for appellee.

CLAY, Commissioner.

In this declaratory judgment proceeding the plaintiff appellee sought an adjudication that he had effectively exercised an option to extend a lease, and a further determination of the amount of rent to be paid. The relief prayed was granted by the Chancellor. The principal issue is whether the option provision in the lease fixed the rent with sufficient certainty to constitute an enforceable contract between the parties.

In July 1951 appellants, the lessors, leased a small lot to appellee, the lessee, for a 10-year term at a rent of $100 per month. The lessee was given an option to extend the lease for an additional 10-year term, under the same terms and conditions except as to rental. The renewal option provided:

"rental will be fixed in such amount as shall actually be agreed upon by the lessors and the lessee with the monthly rental fixed on the comparative basis of rental values as of the date of the renewal with rental values at this time reflected by the comparative business conditions of the two periods."

The lessee gave the proper notice to renew but the parties were unable to agree upon the rent. Preliminary court proceedings finally culminated in this lawsuit. Based upon the verdict of an advisory jury, the Chancellor fixed the new rent at $125 per month.

The question before us is whether the quoted provision is so indefinite and uncertain that the parties cannot be held to have agreed upon this essential rental term of the lease. There have been many cases from other jurisdictions passing on somewhat similar lease provisions and the decisions are in hopeless conflict. We have no authoritative Kentucky decision.

At the outset two observations may be made. One is that rental in the ordinary lease is a very uncomplicated item. It involves the number of dollars the lessee will pay. It, or a method of ascertaining it, can be so easily fixed with certainty. From the standpoint of stability in business transactions, it should be so fixed.

Secondly, as an original proposition, uncomplicated by subtle rules of law, the provision we have quoted, on its face, is ambiguous and indefinite. The language used is equivocal. It neither fixes the rent nor furnishes a positive key to its establishment. The terminology is not only confusing but inherently unworkable as a formula.

The above observations should resolve the issue. Unfortunately it is not that simple. Many courts have become intrigued with the possible import of similar

language and have interpolated into it a binding obligation. The lease renewal option has been treated as something different from an ordinary contract. The law has become woefully complicated. For this reason we consider it necessary and proper to examine this question in depth.

■ The following basic principles of law are generally accepted:

"It is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning." Williston on Contracts (3rd Ed.) Vol. 1, section 37 (page 107).

"Like other contracts or agreements for a lease, the provision for a renewal must be certain in order to render it binding and enforceable. Indefiniteness, vagueness, and uncertainty in the terms of such a provision will render it void unless the parties, by their subsequent conduct or acts supplement the covenant and thus remove an alleged uncertainty. The certainty that is required is such as will enable a court to determine what has been agreed upon." 32 Am.Jur., Landlord and Tenant, section 958 (page 806).

"The terms of an extension or renewal, under an option therefor in a lease, may be left for future determination by a prescribed method, as by future arbitration or appraisal; but merely leaving the terms for future ascertainment, without providing a method for their determination, renders the agreement unenforceable for uncertainty." 51 C.J.S. Landlord and Tenant 56b (2), page 597.

"A renewal covenant in a lease which leaves the renewal rental to be fixed by future agreement between the parties has generally been held unenforceable and void for uncertainty and indefiniteness. Also, as a general rule, provisions for renewal rental dependent upon future valuation of premises without indicating when or how such valuation should be made have been held void for uncertainty and indefiniteness." 32 Am. Jur., Landlord and Tenant, section 965 (page 810).

Many decisions supporting these principles may be found in 30 A.L.R. 572; 68 A.L.R. 157; 166 A.L.R. 1237.

■ The degree of certainty is the controlling consideration. An example of an appropriate method by which a non-fixed rental could be determined appears in Jackson v. Pepper Gasoline Co., 280 Ky. 226, 133 S.W.2d 91, 126 A.L.R. 1370. The lessee, who operated an automobile service station, agreed to pay "an amount equal to one cent per gallon of gasoline delivered to said station". Observing that the parties had created a *definite objective standard* by which the rent could with certainty be *computed,* the court upheld the lease as against the contention that it was lacking in mutuality. (The Chancellor cited this case as authoritative on the issue before us, but we do not believe it is. Appellee apparently agrees because he does not even cite the case in his brief.)

On the face of the rent provision, the parties had not agreed upon a rent figure. They left the amount to future determination. If they had agreed upon a specific method of making the determination, such as by computation, the application of a formula, or the decision of an arbitrator, they could be said to have agreed upon whatever rent figure emerged from utilization of the method. This was not done.

It will be observed the rent provision expresses two ideas. The first is that the parties agree to agree. The second is that the future agreement will be based on a comparative adjustment in the light of "business conditions". We will examine separately these two concepts and then consider them as a whole.

■ The lease purports to fix the rent at such an amount as shall "actually be agreed upon". It should be obvious that an agreement to agree cannot constitute a binding contract. Williston on Contracts (3rd Ed.) Vol. 1, section 45 (page 149); Johnson v. Lowery, Ky., 270 S.W.2d 943; National Bank of Kentucky v. Louisville Trust Co., 6 Cir., 67 F.2d 97.

Slade v. City of Lexington, 141 Ky. 214, 132 S.W. 404, 32 L.R.A.,N.S., 201, has been cited as adopting a contrary view. Certain language in that opinion would seem to justify such contention. However, that case involved very unusual features and some of the broad language used was unnecessary to the decision. The parties (being a legislatively created public service corporation and a municipality) had agreed to renew a contract "upon terms as mutually agreed upon". When the time came for renewal, *both parties agreed upon new terms.* Thus the contract in this respect was *executed.* Since the parties had actually complied with all of its provisions, it was properly held valid and binding as of its inception. No question was raised with respect to the enforceability of the contract as between the parties thereto, which is the issue before us. If this case may be construed to hold that an agreement to agree, standing alone, constitutes a binding contract, we believe it unsound.

As said in Williston on Contracts (3rd Ed.) Vol. 1, section 45 (page 149):

"Although a promise may be sufficiently definite when it contains an option given to the promisor, yet if an essential element is reserved for the future agreement of both parties, the promise gives rise to no legal obligation until such future agreement. Since either party, by the very terms of the agreement, may refuse to agree to anything the other party will agree to, it is impossible for the law to fix any obligation to such a promise."

We accept this because it is both sensible and basic to the enforcement of a written contract. We applied it in Johnson v. Lowery, Ky., 270 S.W.2d 943, page 946, wherein we said:

"To be enforceable and valid, a contract to enter into a future covenant must specify all material and essential terms and leave nothing to be agreed upon as a result of future negotiations."

This proposition is not universally accepted as it pertains to renewal options in a lease. Hall v. Weatherford, 32 Ariz. 370, 259 P. 282, 56 A.L.R. 903; Rainwater v. Hobeika, 208 S.C. 433, 38 S.E.2d 495, 166 A.L.R. 1228. We have examined the reasons set forth in those opinions and do not find them convincing. The view is taken that the renewal option is for the benefit of the lessee; that the parties intended something; and that the lessee should not be deprived of his right to enforce his contract. This reasoning seems to overlook the fact that a party must have an enforceable contract before he has a right to enforce it. We wonder if these courts would enforce an *original* lease in which the rent was not fixed, but agreed to be agreed upon.

■ Surely there are some limits to to what equity can or should undertake to compel parties in their private affairs to do what the court thinks they should have done. See Slayter v. Pasley, Or., 199 Or. 616, 264 P.2d 444, 449; and dissenting opinion of Judge Weygandt in Moss v. Olson, 148 Ohio 625, 76 N.E.2d 875. In any event, we are not persuaded that renewal options in leases are of such an exceptional character as to justify emasculation of one of the basic rules of contract law. An agreement to agree simply does not fix an enforceable obligation.

As noted, however, the language of the renewal option incorporated a secondary stipulation. Reference was made to "comparative business conditions" which were to play some part in adjusting the new rental. It is contended this provides the

necessary certainty, and we will examine a leading case which lends support to the argument.

In Edwards v. Tobin, 132 Or. 38, 284 P. 562, 68 A.L.R. 152, the court upheld and enforced a lease agreement which provided that the rent should be "determined" at the time of renewal, "said rental to be *a reasonable rental* under the then existing conditions". (Our emphasis) Significance was attached to the last quoted language, the court reasoning that since the parties had agreed upon a reasonable rent, the court would hold the parties to the agreement by fixing it.

All rents tend to be reasonable. When parties are trying to reach an agreement, however, their ideas or claims of reasonableness may widely differ. In addition, they have a right to bargain. They cannot be said to be in *agreement* about what is a reasonable rent until they specify a figure or an exact method of determining it. The term "reasonable rent" is itself indefinite and uncertain. Would an original lease for a "reasonable rent" be enforceable by either party? The very purpose of a rental stipulation is to remove this item from an abstract area.

It is true courts often must *imply* such terms in a contract as "reasonable time" or "reasonable price". This is done when the parties fail to deal with such matters in an otherwise enforceable contract. Here the parties were undertaking to fix the terms rather than leave them to implication. Our problem is not what the law would imply if the contract did not purport to cover the subject matter, but whether the parties, in removing this material term from the field of implication, have fixed their mutual obligations.

We are seeking what the agreement actually was. When dealing with such a specific item as rent, to be payable in dollars, the area of possible agreement is quite limited. If the parties did not agree upon such an unequivocal item or upon a definite method of ascertaining it, then there is a clear case of nonagreement. The court, in fixing an obligation under a nonagreement, is not enforcing the contract but is binding the parties to something they were patently unable to agree to when writing the contract.

■ The opinion in the Tobin case, which purportedly was justifying the enforcement of a contractual obligation between the lessor and lessee, shows on its face the court was doing something entirely different. This question was posed in the opinion: "What logical reason is there for equity to refuse to act when the parties themselves *fail to agree* on the rental?" (Our emphasis) The obvious logical answer is that even equity cannot enforce as a contract a nonagreement. No distortion of words can hide the fact that when the court admits the parties "fail to agree," then the contract it enforces is one it makes for the parties.

■ It has been suggested that rent is not a material term of a lease. It is said in the Tobin case: "The method of determining the rent pertains more to form than to substance. It was not the essence of the contract, but was merely incidental and ancillary thereto." This seems rather startling. Nothing could be more vital in a lease than the amount of rent. It is the price the lessee agrees to pay and the lessor agrees to accept for the use of the premises. Would a contract to buy a building at a "reasonable price" be enforceable? Would the method of determining the price be a matter of "form" and "incidental and ancillary" to the transaction? In truth it lies at the heart of it. This seems to us as no more than a grammatical means of sweeping the problem under the rug. It will not do to say that the establishment of the rent agreed upon is not of the essence of a lease contract.

We have examined the Tobin case at length because it exemplifies lines of reasoning adopted by some courts to dredge certainty from uncertainty. Other courts

balk at the process. The majority of cases, passing upon the question of whether a renewal option providing that the future rent shall be dependent upon or proportionate to *the valuation of the property* at the time of renewal, hold that such provision is not sufficiently certain to constitute an enforceable agreement. See cases cited in 30 A.L.R. 579 and 68 A.L.R. 159. The valuation of property and the ascertainment of "comparative business conditions," which we have under consideration, involve similar uncertainties.

A case construing language closely approximating that in the lease before us is Beal v. Dill, 173 Kan. 879, 252 P.2d 931. The option to extend the lease provided: "said rental shall be subject to reasonable adjustment, up or down, depending upon general business conditions then existing." The Kansas Supreme Court, purporting to follow what it deemed the "majority rule" (and citing numerous authorities), held this language was too indefinite to be enforceable.

The opposite conclusion on similar language was reached in Greene v. Leeper, 193 Tenn. 153, 245 S.W.2d 181. The option provided for: "a rental to be agreed on according to business conditions at that time." The court, declaring that "rental can be determined with reasonable certainty by disinterested parties," adjudged this was an enforceable provision. The court indicated in the opinion that real estate experts would have no difficulty in fixing the rental agreed upon. The trouble is the parties did not agree to leave the matter to disinterested parties or real estate experts, and it is a false assumption that there will be no differences of opinion.

A similar renewal option was enforced in Fuller v. Michigan National Bank, 342 Mich. 92, 68 N.W.2d 771. In that case the language was "at a rent to be agreed upon, dependent on then existing conditions, * * *". The court treated the problem as one involving an *ambiguity*. Synonyms for the word "ambiguous" are: indeter-

minate, indefinite, unsettled. This dubiosity is of course what makes it clear the parties had failed to reach an *agreement*.

We do not think our problem can be solved by determining which is the "majority" rule and which is the "minority" rule. We are inclined, however, to adhere to a sound basic principle of contract law unless there are impelling reasons to depart from it, particularly so when the practical problems involved in such departure are so manifest. Let us briefly examine those practical problems.

What the law requires is an adequate key to a mutual agreement. If "comparative business conditions" afforded sufficient certainty, we might possibly surmount the obstacle of the unenforceable agreement to agree. This term, however is very broad indeed. Did the parties have in mind local conditions, national conditions, or conditions affecting the lessee's particular business?

That a controversy, rather than a mutual agreement, exists on this very question is established in this case. One of the substantial issues on appeal is whether the Chancellor properly admitted in evidence the consumer price index of the United States Labor Department. At the trial the lessor was attempting to prove the change in local conditions and the lessee sought to prove changes in national conditions. Their minds to this day have never met on a criterion to determine the rent. It is pure fiction to say the court, in deciding upon some figure, is enforcing something the parties agreed to.

One aspect of this problem seems to have been overlooked by courts which have extended themselves to fix the rent and enforce the contract. This is the Statute of Frauds. The purpose of requiring a writing to evidence an agreement is to assure certainty of the essential terms thereof and to avoid controversy and litigation. See 49 Am.Jur., Statute of Frauds, section 313 (page 629); section 353 (page

663); section 354 (page 664). This very case is living proof of the difficulties encountered when a court undertakes to supply a missing essential term of a contract.

In the first place, when the parties failed to enter into a new agreement as the renewal option provided, their rights were no longer *fixed* by the contract. The determination of what they were was automatically shifted to the courtroom. There the court must determine the scope of relevant evidence to establish that certainty which obviously cannot be culled from the contract. Thereupon extensive proof must be taken concerning business conditions, valuations of property, and reasonable rentals. Serious controversies develop concerning the admissibility of evidence on the issue of whether "business conditions" referred to in the lease are those on the local or national level, or are those particularly affecting the lessee's business. An advisory jury is impanelled to express its opinion as to the proper rental figure. The judge then must decide whether the jury verdict conforms to the proof and to his concept of equity. On appeal the appellate court must examine alleged errors in the trial. Assuming some error in the trial (which appears likely on this record), the case may be reversed and the whole process begun anew. All of this time we are piously clinging to a concept that the contract itself fixed the rent with some degree of certainty.

■ We realize that litigation is oft times inevitable and courts should not shrink from the solution of difficult problems. On the other hand, courts should not expend their powers to establish contract rights which the parties, with an opportunity to do so, have failed to define. As said in Morrison v. Rossignol, 5 Cal. 64, quoted in 30 A.L.R. at page 579:

> "A court of equity is always chary of its power to decree specific performance, and will withhold the exercise of its jurisdiction in that respect, unless there is such a degree of certainty in the terms of the contract as

will enable it at one view to do complete equity."

That cannot be done in this case.

Stipulations such as the one before us have been the source of interminable litigation. Courts are called upon not to enforce an agreement or to determine what the agreement was, but to write their own concept of what would constitute a proper one. Why this paternalistic task should be undertaken is difficult to understand when the parties could so easily provide any number of workable methods by which rents could be adjusted. As a practical matter, courts sometimes must assert their right not to be imposed upon. This thought was thus summed up in Slayter v. Pasley, Or., 264 P.2d 444, page 449:

> "We should be hesitant about completing an apparently legally incomplete agreement made between persons sui juris enjoying freedom of contract and dealing at arms' length by arbitrarily interpolating into it our concept of the parties' intent merely to validate what would otherwise be an invalid instrument, lest we inadvertently commit them to an ostensible agreement which, in fact, is contrary to the deliberate design of all of them. It is a dangerous doctrine when examined in the light of reason. Judicial paternalism of this character should be as obnoxious to courts as is legislation by judicial fiat. Both import a quality of jural ego and superiority not consonant with long-accepted ideas of legistic propriety under a democratic form of government. If, however, we follow the urgings of the lessee in the instant matter, we will thereby establish a precedent which will open the door to repeated opportunities to do that which, in principle, courts should not do and, in any event, are not adequately equipped to do."

■ We think the basic principle of contract law that requires substantial cer-

tainty as to the material terms upon which the minds of the parties have met is a sound one and should be adhered to. A renewal option stands on the same footing as any other contract right. Rent is a material term of a lease. If the parties do not fix it with reasonable certainty, it is not the business of courts to do so.

The renewal provision before us was fatally defective in failing to specify either an agreed rental or an agreed method by which it could be fixed with certainty. Because of the lack of agreement, the lessee's option right was illusory. The Chancellor erred in undertaking to enforce it.

The judgment is reversed.