Ardel Dela Calzada CAGATA,
Appellant

.v.

Sandra Carrie CAGATA (now Taylor), Appellee

NO. 2014–CA–000654–MR

Court of Appeals of Kentucky.

RENDERED: APRIL 24, 2015; 10:00 A.M.

Discretionary Review Denied by Supreme Court December 10, 2015

Briefs for Appellant: Louis P. Winner, Sarah M. Tate, Louisville, Kentucky

Brief for Appellee: Delores Pregliasco, Louisville, Kentucky

BEFORE: COMBS, J. LAMBERT, AND STUMBO, JUDGES.

## OPINION

J. LAMBERT, JUDGE:

In this post-dissolution proceeding, Ardel Dela Calzada Cagata has appealed from the orders of the Jefferson Family Court ordering him to pay his children's parochial high school tuition and associated costs pursuant to a settlement agreement. Finding no error, we affirm.

Ardel and Sandra Carrie Cagata (Carrie) were married in 1998 in Jefferson County, Kentucky. Three children were born of the marriage: Collin, born August 13, 1999; and twins Ethan and Camryn, born July 3, 2001. The parties separated in December 2006, and Carrie filed a petition to dissolve the marriage in February 2007. In the petition, Carrie requested that the court incorporate their property settlement agreement into the decree, award joint custody, order Ardel to pay reasonable child support and maintenance, restore her non-marital property, equitably divide the parties' marital real and personal property, and provide for the payment of marital debts and financial obligations. Ardel filed a response and counterclaim, requesting restoration of his non-marital property. Carrie was not working at the time she filed her petition, and Ardel was earning approximately $33,942.00 per month at Inpatient Care Specialist PLLC, a medical practice in which he had a 50% ownership interest.

On May 1, 2007, the family court entered a final decree dissolving the marriage, awarded the parties joint custody of the seven and five-year-old children, found the Agreed Order entered into between the parties to not be unconscionable, and incorporated this agreement into the decree. The Agreed Order, signed April 6, 2007, addressed several issues, including designation of Carrie as the primary residential parent, parenting time with the children, health insurance for the children, tax exemptions, payments into college funds, Ardel's interest in Inpatient Care Specialist PLLC, the parties' residences, the parties' vehicles, life insurance policies, checking accounts, IRA accounts, and the payment of debts. The Agreed Order also specified that Ardel was to pay Carrie $4,000.00 per month in maintenance for three years or for one year from the date she obtained full-time employment, but she was not to receive maintenance any longer than three years from May 1, 2007. Specifically related to the issue on appeal, Paragraph 6 of the Agreed Order stated:

> The parties have agreed to deviate from the current Kentucky Child Support Guidelines, as a result of an agreement between the parties with reference to the payment of expenses for the children.

> The month following the last maintenance payment, [Ardel] shall pay as child support to [Carrie] for the parties' three (3) infant children the sum of $2,400.00 per month pursuant to Kentucky Revised Statutes. Said child sup-

port is reviewable by agreement of the parties or order of the Court.

Paragraph 12 stated:

The parties agree that all three (3) children shall attend an agreed upon parochial school through the eighth grade, and [Ardel] agrees to pay the cost of tuition, books, registration and other fees, and uniforms for all three (3) children through the eighth grade, at an agreed upon parochial school.

The parties intend for the children to attend parochial high school. [Ardel] agrees that it is his intention to pay the cost of tuition, books, fees and uniforms for all three (3) children for a parochial high school, unless due to extraordinary financial circumstances, he is not able to make said payments.

More than six years later, in July 2013, Carrie filed a motion to enforce the Agreed Order. Specifically, Carrie sought to enforce Paragraph 12 regarding the parties' agreement that Ardel would pay for the children's parochial high school costs, unless extraordinary financial circumstances prevented him from doing so. She stated that their oldest son would be entering high school in the fall, and she and Ardel had agreed that he would attend St. Xavier. Ardel had taken Collin to register for classes and paid the registration fees, but then refused to pay the tuition and related costs as they had previously agreed. Carrie stated that Ardel earned approximately $33,942.00 per month, or $407,307.00 per year, in 2007, when he was also paying maintenance. Carrie attached a 2012 W–2 form from Norton Healthcare, Inc., showing that Ardel's gross income was $415,822.66, and she noted that he was no longer paying maintenance. She asserted that Ardel's financial circumstances had not changed in any extraordinary way, and he should therefore be required to comply with the terms of the Agreed Order.

In response, Ardel objected to Carrie's motion, arguing that they had never agreed that he would pay for the children's private high school tuition. Citing *Miller v. Miller*, 459 S.W.2d 81, 83 (Ky.1970), Ardel argued that a parent could not be forced to pay for private education absent proof that the public schools were inadequate to meet the child's educational needs, which was not at issue in this case. He argued that the language of the agreement did not create a binding contract requiring him to pay for private high school because it would depend upon the circumstances and his financial situation. Ardel went on to state that he had accepted the debt on the marital home pursuant to the Agreed Order, at a time when Carrie was unemployed and had no ability to pay that debt. He was also responsible for almost all of the children's expenses, including child care, private grammar school, college savings, health insurance, and life insurance. He stated that after signing the Agreed Order, the real estate market dropped, and he had to sell the marital residence, along with the marital consumer debt that had been rolled into the mortgage, at a loss, and he was solely responsible for paying off the unsecured marital debt of almost $300,000.00. He was paying $4,000.00 per month toward this debt.

Ardel stated that he and Carrie had had several discussions regarding private school. He had told her for several years that he had never agreed to pay for private high school, that he could not afford private high school along with the other expenses he bore for the children including child support as well as the marital debt, and that there were good public high schools available for the children. He did not believe it was in the children's best

interests to attend private high school due to his financial situation and Carrie's refusal to help with the cost. He also pointed out that neither party intended for Collin to attend a parochial high school; they had encouraged him to attend a public school, duPont Manual High School (Manual), but his application was denied. When Ardel attempted to suggest that Collin should attend either Ballard High School or North Oldham High School, Carrie refused and insisted that he attend St. Xavier along with her step-sons. Ardel stated that Carrie promised to help by paying 20% of private school for the three children as well as a portion of the additional costs of St. Xavier. Based on this promise, Ardel took Collin to register for classes. However, Carrie refused to abide by her promise after he had been enrolled.

Finally, Ardel stated that his current income was approximately $385,000.00 per year, less than in 2007 when child support was calculated and when Carrie did not have an income. He stated that Carrie received $2,400.00 per month in child support and was employed full-time by Norton Healthcare Systems, but she refused to provide her income.

In an attached affidavit, Ardel discussed his agreement with Carrie that she pay a portion of the children's school costs. Ardel stated that Carrie had initially agreed to sign a written agreement memorializing their verbal and text agreements, but she ultimately refused to do so. He again stated that he had agreed to take on 100% of the marital debt because Carrie had no income and he had no way of knowing that the real estate market would crash. Because of the payment of the marital debts as well as child support and associated costs, he said he had no savings and had been able to save very little for his retirement.

The family court ordered the parties to mediate the issue, which was unsuccessful. The court proceeded with a hearing on Carrie's motion on January 9, 2014.

Carrie called Ardel to testify first. He was employed at Norton Healthcare as a physician, and had worked there for four years. Norton bought out his private practice in 2009, and he received a little over $100,000.00 from this transaction. He earned $385,000.00 per year at Norton, and he also earned additional income for extra work. On his 2007 mandatory case disclosure, Ardel had listed his gross income as $33,942.00 per month. He kept his retirement accounts and his practice in the dissolution proceedings. His pay information from Norton showed that he had earned $319,656.19 in gross pay as of the period ending September 21, 2013, and that his pay had not changed since that time. He earned additional money from Norton when he worked extra weekends or extra nights over what he was required to work. He would earn $1,000.00 for weekend days and $800.00 for nights. He estimated that he had earned an additional $25,000.00 in 2012. Ardel went on to testify about his tax return records. He was no longer paying maintenance in 2009. At the time of the divorce, he still had a student loan between $70,000.00 and $80,000.00 that he had since paid off. His car was also paid off. Regarding the $4,000.00 per month he paid in marital debt, Ardel said that debt had come up after the dissolution.

Regarding Collin's education, Ardel stated that Collin had not gotten into Manual but had also applied to St. Xavier. He claimed he was not able to afford to pay the costs of St. Xavier. Tuition at St. Xavier is $12,000.00 per year. He said that he told Carrie that if she did not pay 20% of the tuition and costs, Collin could not go to St. Xavier. He thought he and

Carrie had reached an agreement that he would pay 100% of the tuition at St. Mary, 80% of the tuition at St. Xavier, and she would pay everything else.

Ardel testified that he paid the mortgage and utilities for the house he owned with his current wife. The payment was around $2,800.00 per month. He paid all of the household expenses; his wife, an attorney, did not contribute to these expenses, but she had paid the $100,000.00 down payment to purchase the house. She also paid off his student loans. Ardel stated that he no longer had child care expenses, and his health insurance costs had decreased. He was only paying tuition for the two children at St. Mary, which totaled $800.00 per month, as well the associated costs.

Ardel testified that the $4,000.00 monthly payments were to pay off the debt he incurred when he sold the marital residence. Ardel said he sold the house five months after the dissolution, and he lost $300,000.00 on the sale. He currently owed about $102,000.00 on the loan. That property had been worth more than $1,000,000.00. Ardel said he was able to pay all of his monthly bills, but he had been forced to put some expenses on a credit card because he did not have enough money at the end of the month. His credit card had a balance of $16,966.14. He was not able to pay it off every month.

Carrie was the next witness to testify. She testified about payments she had made for Collin's education at St. Xavier, including a portion of tuition, books, various fees, transportation, meals, and a portion of his clothing. She had spent over $700.00 on clothing, while Ardel had paid about $200.00. She explained how the issues arose regarding the payment of tuition. She said that St. Xavier was Collin's second choice after he did not get accepted at Manual. Ardel was informed about every step of the process to transfer Collin from St. Mary to Manual. Toward the end of the summer, Ardel told her that he was not going to be able to handle the financial requirements and that if she did not do anything to help, Collin would not be able to attend St. Xavier. Carrie went through the text messages between her and Ardel detailing their conversations about the tuition and her desire to consult with her attorney regarding any agreement. She said they had talked about numbers and had discussed that she would pay 20% of the tuition for St. Xavier. Knowing that Collin had been upset that he had not been accepted at Manual, she did not want to have to tell him that he could not attend St. Xavier because she was unable to pay the tuition.

Carrie began working in November 2007, and her maintenance ended one year later. She is currently a registered nurse making $32.42 per hour. The children were raised and baptized Catholic, although she was not Catholic. They had attended St. Mary, a parochial school, since preschool. She has a disabled son from a prior marriage who was awarded funds that are in a trust for his benefit. She used funds from the trust to put a down payment on a home where they could all live.

On cross-examination, Carrie agreed she had said that she and Ardel had reached an agreement that she would pay 20% of the tuition, but this agreement was made while she was under emotional pressure and duress. She said Collin was devastated that he had not been accepted into Manual, and she did not want to upset her son again by not permitting him to attend St. Xavier, his second choice. She said she was being emotionally badgered by Ardel to help him pay the tuition, or he would not allow their son to attend St. Xavier, which he had already agreed to do. She

had been paying 20% of Collin's tuition ($243.50 per month) since he started at St. Xavier.

Ardel testified again, this time regarding the text messages between him and Carrie. He said the list of text messages admitted did not contain all of the applicable messages and that another earlier set of text messages indicated that they had reached an agreement. He agreed that he told Carrie that if she did not pay 20%, he was not going to pay for Collin to attend St. Xavier.

In his post-hearing memorandum, Ardel argued that the Agreed Order did not evidence a meeting of the minds regarding private high school and that he therefore could not be forced to pay such expenses. He contended that the language differences in Paragraph 12 regarding the children's education up to the eighth grade and high school demonstrated that there was not a legally binding contract for him to pay for private high school. The provision merely stated his intention to pay in the future, dependent on other circumstances, which he claimed did not create a binding contract.

In her post-hearing memorandum, Carrie contended that only one issue was before the court; namely, whether extraordinary financial circumstances prevented Ardel from paying for the children's parochial high school education. The burden was on Ardel to prove the existence of extraordinary financial circumstances. She went on to detail his financial circumstances, including the increase in his income following the 2007 Agreed Order, the bonus of more than $100,000.00 he received when his medical practice was purchased, that he no longer paid maintenance, his need to pay only two elementary school costs instead of three, the decrease in health insurance costs, the lack of child care costs, the increase in his

IRA account as well as a new retirement account, and that his new wife had paid the down payment on their new home. Carrie argued that Ardel had failed to establish that there were any financial circumstances that prevented him from paying for the children's parochial high school costs. In fact, she argued that his financial circumstances had improved over the years since the dissolution. Carrie requested that the court enforce the terms of the Agreed Order and that she be reimbursed for the 20% of the costs that she had been forced to pay.

On February 20, 2014, the family court entered an order ruling on Carrie's motion. The court first addressed the interpretation of the Agreed Order and whether the provision regarding the payment of parochial high school expenses was enforceable. The court found that the Agreed Order was unambiguous and that based upon the agreement, the parties intended that Ardel pay for parochial high school tuition and related expenses for the children.

This is a continuation of the parties' arrangement for parochial school through eighth grade. The Agreed Order states the parties deviated from the Kentucky Child Support Guidelines based on the agreement regarding the expenses for the children. It would follow that the later provisions regarding payment of school expenses represents the agreed-upon allocation of these expenses. Dr. Cagata's payment of parochial high school expenses, barring extraordinary financial circumstances, was part of the bargained-for exchange between the parties, and was meant to be an enforceable provision of the agreement.

The provision regarding parochial high school is sufficiently definite to be enforceable, and is not an agreement to

later agree. The provision plainly states the material terms: that the entire cost of tuition, books, fees, and uniforms for the three children to attend parochial high school is allocated to Dr. Cagata. Dr. Cagata emphasizes the difference in the wording between the provision regarding school through eighth grade and the provision regarding high school. The high school provision uses different language because it is conditional upon whether or not Dr. Cagata has extraordinary financial circumstances that prevent him from making the payments. The preceding provision has no such condition. Additionally, the high school provision was an agreement regarding a future event. None of the parties' children [was] in high school at that time. One, or possibly all, of the children were of age to attend parochial school for lower grades. The language differs because one provision is describing current arrangements whereas the other is describing future arrangements. Even assuming the provision was stating an intention or agreement to agree later, the Court believes that the principles of equity would require the provision be enforced. Therefore, the Court finds the April 24, 2007 Agreed Order requires Dr. Cagata to pay the cost of tuition, books, fees and uniforms for the three children to attend parochial high school, unless due to extraordinary financial circumstances, he is not able to make said payments.

The family court went on to find that "no extraordinary financial circumstances exist that would prevent Dr. Cagata from paying tuition and related costs for parochial high school at this time." The court reviewed Ardel's income records and noted that he had received a payment of approximately $100,000.00 when he sold his practice. Ardel earned a gross income in 2012 of $432,822.66, and Ardel testified that his current annual base salary is $385,000.00. He also earned additional income by working extra nights and weekends, where he made $1,000.00 per weekend day and $800.00 per night. He was paying $2,400.00 per month in child support, had paid off a student loan debt, and contributed a "considerable" amount to his retirement accounts. He was also paying $4,000.00 per month on debt associated with the marital residence that had been sold. $102,000.00 remained to be paid on that debt. Finally, he was paying approximately $800.00 per month for the younger children's school, and the tuition for St. Xavier was $12,000.00 per year. The court concluded, "Dr. Cagata's financial circumstances are similar to what they were at the time of the divorce. No extraordinary circumstances exist at this time that would prevent him from paying tuition and related expenses for parochial high school."

Next, the family court considered whether the Agreed Order had been modified by a subsequent agreement that Carrie would pay a portion of the school tuition and costs. The court noted that while both parties acknowledged an agreement was made regarding tuition, Carrie stated that she only agreed to the modification so that Collin would be able to attend St. Xavier as planned. The court found that the new agreement had been proven with reasonable certainty that Ardel would pay 80% of the St. Xavier tuition and that Carrie would pay the remainder of the tuition and remaining costs. The court found "the only duration agreed upon by the parties provable by a reasonable certainty is the 2013–2014 school year." The court found that the agreement was fair and equitable under the circumstance of the case, that Ardel's statements to Carrie that Collin would not be able to attend St. Xavier unless she contributed financially did not rise to the

level of duress, and that the agreement was enforceable. The court concluded:

IT IS HEREBY ORDERED that Dr. Cagata is obligated by the April 24, 2007 Agreed Order to pay the cost of tuition, books, fees and uniforms for all three (3) children for a parochial high school, unless due to extraordinary financial circumstances, he is not able to make said payments. The Court makes a finding that no such extraordinary financial circumstances exist at this time.

IT IS FURTHER ORDERED that the April 24, 2007 Agreed Order was modified by agreement as follows: Dr. Cagata shall pay eighty percent of the tuition for Collin to attend Saint Xavier for the 2013–2014 school year, and Ms. Taylor shall pay twenty percent of the tuition and the remaining costs for Collin to attend Saint Xavier for the 2013–2014 school year. The parties shall follow this agreement regarding tuition and costs to attend Saint Xavier for the 2013–2014 school year, and follow the April 24, 2007 Agreed Order thereafter.

Ardel filed a motion to alter, amend, or vacate the family court's order, arguing that the language in the Agreed Order did not support a legal finding that there was an enforceable contract requiring him to pay for the children to attend parochial high school. He continued to argue that the provision was merely the statement of an intention that something might happen in the future and was not sufficiently definite to create an enforceable contract. In response, Carrie argued that the only contingency in the provision was if Ardel was unable to pay for the parochial high school costs due to extraordinary financial circumstances, which he failed to establish.

The family court entered an order on March 21, 2014, denying Ardel's motion. The court observed, "the agreement as a whole was a bargained-for exchange be-

tween the parties that included the allocation of these school expenses" and "that the difference in language is attributable to the condition regarding Dr. Cagata's financial circumstances and the fact that the children were not attending high school at the time of the agreement." This appeal now follows.

On appeal, Ardel continues to argue that the family court erred in ordering him to pay for parochial high school pursuant to the terms of the Agreed Order.

This Court set forth the applicable standard of review in *Money v. Money*, 297 S.W.3d 69, 71–72 (Ky.App.2009):

The terms of a settlement agreement set forth in a decree of dissolution of marriage are enforceable as contract terms. KRS 403.180(5). The construction and interpretation of a contract is a matter of law and is reviewed under the *de novo* standard. *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky.App.1998).... "Absent an ambiguity in the contract, the parties' intentions must be discerned from the four corners of the instrument without resort to extrinsic evidence." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky.App. 2002).

With this standard in mind, we shall consider Ardel's arguments.

For his first argument, Ardel contends that the portion of Paragraph 12 of the Agreed Order related to the payment of tuition for parochial high school is not enforceable or legally binding because it is too vague, ambiguous, and undefined to constitute a legally enforceable agreement. He also briefly makes the argument that the agreement is unconscionable. The provision at issue states in full:

The parties agree that all three (3) children shall attend an agreed upon parochial school through the eighth

grade, and [Ardel] agrees to pay the cost of tuition, books, registration and other fees, and uniforms for all three (3) children through the eighth grade, at an agreed upon parochial school.

The parties intend for the children to attend parochial high school. [Ardel] agrees that it is his intention to pay the cost of tuition, books, fees and uniforms for all three (3) children for a parochial high school, unless due to extraordinary financial circumstances, he is not able to make said payments.

Our focus is on the second paragraph of the provision.

Ardel contends that the Agreed Order failed to set forth reasonably certain terms regarding his intent to pay for parochial high school, including what constituted "extraordinary financial circumstances." In addition, he cites to *Money v. Money, supra,* for the proposition that "[i]f the settlement agreement is initially approved by the trial court, it may nevertheless be later modified if the party challenging the agreement can demonstrate that the agreement has become unconscionable because of changed circumstances." *Id.* at 72, citing *Bailey v. Bailey,* 231 S.W.3d 793, 796 (Ky.App.2007).

We agree with Carrie that this provision of the Agreed Order is neither vague nor ambiguous. Rather, as the family court concluded, this provision set forth clearly and plainly that Ardel was to pay for the children's parochial high school tuition and associated costs so long as extraordinary financial circumstances did not prevent him from doing so. At the time he and Carrie entered into the Agreed Order, the children were still in elementary school, explaining the difference in the language used. We also agree with the family court that this portion of the Agreed Order was in line with the parties' agreement to deviate from the Child Support Guidelines re-garding Ardel's child support obligation, which did not begin until his maintenance payments to Carrie ended.

■ We further disagree with Ardel that the "extraordinary financial circumstances" condition in the provision was not effective, and therefore, made the provision unenforceable, because the Agreed Order did not specifically define or provide a formula to define the condition. Rather, it was up to Ardel to establish through proof that extraordinary financial circumstances prevented him from paying for parochial high school. Again, this was part of the bargained-for agreement between the parties.

We also reject Ardel's argument that the parochial high school provision was an undefined declaration of intent and was therefore not an agreement. He relies upon *Walker v. Keith,* 382 S.W.2d 198 (Ky.1964), and *Stevens v. Stevens,* 798 S.W.2d 136 (Ky.1990), for the Supreme Court's analysis of contract law and future covenants to support his argument. Examining *Walker,* the *Stevens* Court observed:

An agreement to agree in the context of leases was discussed in *Walker v. Keith,* Ky., 382 S.W.2d 198 (1964). The parties in *Walker* entered into a lease agreement that specified both the term and the monthly rent. The lease contained an option for renewal, which provided that "rent would be fixed in such amounts as shall actually be agreed upon by the lessors and lessee." *Id.* at 199. In determining whether the provision for renewal was binding, the Court stated that "[t]he degree of certainty is the controlling consideration." *Id.* at 200. The Court also quoted with approval the following passage from *Am. Jur.:* "[t]he certainty that is required [in renewal provisions] is such as will enable a court to determine what has been

agreed upon." *Id.* In *Walker*, the Court held that the language of the renewal option created an unenforceable agreement to agree due to lack of certainty as to monthly rent, and stated that the subject matter of the case was not of such an exceptional character as to justify an exercise of the court's powers of equity. *Id.* at 201.

*Stevens*, 798 S.W.2d at 139. *Stevens* dealt with the provision of a property settlement agreement in which the father stated his intention to provide for the daughter's undergraduate college education. The provision stated that "the amount and nature thereof shall hereafter be mutually agreed upon by [the father] and [the daughter.]" *Id.* at 137. The Supreme Court reversed the Court of Appeals' opinion that this provision constituted an agreement to agree and was not, therefore, enforceable. However, the Supreme Court upheld the provision under equity principles.

In the present case, we disagree with Ardel that Paragraph 12 contained an undefined declaration of intent. The provision specifically stated that Ardel intended to pay for the children's parochial high school education, unless extraordinary financial circumstances prevented him from doing so. There is nothing undefined about this provision. Rather, the provision was simply conditional upon Ardel's financial circumstances.

Finally, we reject Ardel's argument that principles of equity do not support the family court's decision. He again cites to *Stevens, supra*. We note that in *Stevens*, the Supreme Court essentially upheld what would have been an unenforceable agreement to agree based upon the equities of the case by concluding that the father's intention to pay for the daughter's college education was clear. Considering the circumstances of this case, we do not believe that the principles of equity necessitate a reversal in Ardel's favor, as the provision clearly established Ardel's intention to pay those costs if the stated condition did not apply.

As Carrie has argued, Ardel had the burden to establish that extraordinary financial circumstances existed to excuse him from paying for the children's parochial high school education. This he utterly failed to do. Ardel is a doctor who has earned approximately $400,000.00 [1] per year from the time the Agreed Order was approved in 2007 to 2013. It appears that his lowest base salary during this time period was $385,000.00, which was supplemented with earnings from additional work he performed. In 2007, he had a monthly gross income of $33,942.00, or $407,304.00 per year. In 2012, he earned a gross income of $432,922.66. In 2013, he testified that his base salary was $385,000.00, but he also earned additional income by working extra nights and weekends. He estimated that he had earned $25,000.00 in 2012 from his extra work. Furthermore, he received $100,000.00 when he sold his interest in his medical practice, and his current wife paid off his student loan. He no longer paid maintenance or child care costs, and he did not have a car payment. His payment to St. Mary had been reduced to $800.00 per month because Collin was entering high school and only the younger children attended that school. The only additional expense came about from his decision after the decree was entered to sell the marital residence, which he was awarded pursuant to the Agreed Order, and he incurred a $300,000.00 loss due to the addition of credit card debt. He paid $4,000.00 per month on this debt, which had been re-

---

1. This amount varied from year to year.

duced to $102,000.00 at the time of the hearing. We agree with the family court that Ardel's financial circumstances are similar to what they were in 2007 and that he has therefore failed to establish any extraordinary financial circumstances that would excuse him from having to pay for the children's parochial high school education.

For the foregoing reasons, the orders of the Jefferson Family Court are affirmed.

ALL CONCUR.